Frank Robbins **DORSEY**,
Plaintiff–Appellant,

v.

**UNITED PARCEL SERVICE**,
Defendant–Appellee.

No. 98–6464.

United States Court of Appeals,
Sixth Circuit.

Argued: Sept. 23, 1999.

Decided and Filed: Nov. 4, 1999.

Edward K. Black (argued and briefed), Edward K. Black, P.S.C., LaGrange, Kentucky, for Plaintiff–Appellant.

Tony C. Coleman (argued and briefed), Brown, Todd & Heyburn, Louisville, Kentucky, Matthew R. Westfall, Jr. (briefed), Westfall, Talbott & Woods, Louisville, Kentucky, for Defendant–Appellee.

Before: MERRITT and CLAY, Circuit Judges; ALDRICH, District Judge.(*)

## OPINION

MERRITT, Circuit Judge.

This appeal by plaintiff Dorsey, a former UPS pilot discharged for concerted union organizing, arises from an order and opinion entered in the district court denying his motion for partial summary judgment on liability and granting defendant's motion for summary judgment on liability. The district court entered its order in favor of the defendant because the district court concluded that Dorsey was a management official of UPS and thus his organizing activity was not protected by the Railway Labor Act. It is undisputed that UPS first transferred Dorsey from one job to another, then refused to allow him to

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

**816**

return to his old job and discharged him— all expressly because he engaged in union organizing activity. The only question before us is whether Dorsey was an "employee or subordinate official" entitled to engage in concerted union organizing activities under the Act. We conclude that Dorsey was a "subordinate official," not a manager, and that his concerted organizing activities were protected conduct. No issue is raised concerning our jurisdiction nor is any issue raised regarding the exhaustion of administrative remedies under the Railway Labor Act.

## I.

■ Dorsey was a pilot for UPS before he was fired. As a "flight training supervisor," Dorsey attempted to gain union recognition and representation for a group of pilot employees whose general job title was "flight qualified supervisors." This general position included assistant chief pilots, flight training supervisors, systems operations supervisors, flight standards supervisors, and flight test supervisors. The key issue on appeal is whether Dorsey can claim protection under the Act for his efforts to organize these employees. Under the Act, if Dorsey's position is managerial then the parties and the court below agree that he is entitled to no protection and is subject to discharge in retaliation for his organizing efforts, but if Dorsey's position is that of an "employee or subordinate official," then UPS has committed an unfair labor practice in retaliating against him.

When Dorsey began his organizing activities, he was a "flight training supervisor." But after UPS learned of his efforts to gain union representation for certain categories of pilots, UPS transferred him to the position of "assistant chief pilot." The district court commented that UPS appears to have transferred Dorsey "into a position with more management characteristics in order to facilitate termination." UPS itself admits—as it must, because the written record demonstrates it so clearly—

that it transferred Dorsey solely because of his efforts to organize his fellow pilots and that UPS refused to transfer him back to his former position only because he would not desist in his efforts.

The district court ruled that the plaintiff failed to claim that the transfer itself constituted an act of impermissible retaliation under the Act. Because of this ruling, the district court made no analysis of the status of the position of "flight qualified supervisor" but focused only on whether the position of "assistant chief pilot" was an "employee or subordinate official" position protected by the Act. The district court overlooked the fact that paragraph 38 of the Complaint clearly states that "Mr. Coonley [a UPS management official] informed Capt. Dorsey that the transfer [to assistant chief pilot] was made solely because of his 'recent activities' [in attempting to organize fellow pilots]." UPS specifically admitted the truth of these allegations in its Answer. Although the district court stated that it would analyze only the job of assistant chief pilot under the Act because "the parties conducted no discovery on the issue of Dorsey's transfer," there was no reason for further discovery on this issue because UPS expressly admitted that the transfer was in retaliation for his organizing activities. UPS also admits that it decided that the plaintiff would be fired if he continued his organizing activities, and that the plaintiff was in fact fired for this reason. We thus conclude that Dorsey clearly alleged both that the involuntary transfer and his discharge constituted an unfair labor practice. The district court simply erred in its conclusion that Dorsey did not so claim.

## II.

The Railway Labor Act was originally enacted in 1926 and applied only to rail carriers, 45 U.S.C. § 151; but with the rise of air travel, in 1936 Congress extended coverage of the Act to air carriers engaged in interstate or foreign commerce,

45 U.S.C. §§ 181–82. Under the Act, employees have the right to engage in concerted activities for the purpose of organizing and bargaining collectively through representatives of their choosing. Section 152, Fourth of the Act has a broad prohibition against anti-union activities by carriers: "no carrier ... shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice," nor may it "interfere in any way with the organization of its employees ..." nor "influence or coerce employees in an effort to induce them to join ... or not to join or remain members of any labor organization...." 45 U.S.C. § 152 Fourth. Then in the section of the statute that is crucial to this case, an employee of an air carrier protected under the Act is defined as "every air pilot or other person who performs any work in the manner of an employee or subordinate official" for a carrier, 45 U.S.C. § 181. The Act does not specifically further define the words, "who performs any work in the manner of an employee or subordinate official."

■ The words "subordinate official" in the definition of those protected—*i.e.*, "employee or *subordinate official*"—means that the Act covers workers at a higher level than mere employees and laborers who have no supervisory authority. 45 U.S.C. § 181. The word "official," which is not found in other labor laws such as the National Labor Relations Act, means one who holds an "office" or is "serving in a public position," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1963). The wording of the Act means that top management is not included but that "officials" at a lower level with substantial responsibilities are included. To use an analogy, the phrase covers sergeants, lieutenants and captains, but not generals. We have not found any Supreme Court or Court of Appeals case law that defines "subordinate official" or any other case law that is particularly helpful in analyzing the scope of that phrase.

The National Mediation Board, which oversees disputes under the Railway Labor Act, has developed a general, multi-factor definition of the phrase "employee or subordinate official." The Board's present "Representation Manual" at § 5.312 lists a number of factors, including:

(1) the authority to discharge and/or discipline employees or to effectively recommend the same;

(2) the extent of supervisory authority;

(3) the ability to authorize and grant overtime;

(4) the authority to transfer and/or establish assignments;

(5) the authority to create carrier policy;

(6) the authority and the extent to which carrier funds may be committed;

(7) whether the authority exercised is circumscribed by operating and policy manuals;

(8) the placement of the individual in the organizational hierarchy of the carrier; and

(9) any other relevant factors regarding the individual's duties and responsibilities.

### III.

■ Contrary to the district court's analysis of the jobs of "flight training supervisor" and "assistant chief pilot," we find nothing in this record to indicate that the people occupying these positions are top management and not "subordinate officials." All the evidence shows that flight training supervisors and assistant chief pilots were lateral positions, and counsel for UPS at oral argument so stated. The record contains no evidence that these flight training supervisors and assistant chief pilots have the authority to hire and fire flight or ground crew members, the authority to establish the pay or benefits of such individuals, the authority to establish written UPS policies, the discretion to spend UPS funds above a minor amount, or to significantly affect corporate organi-

zation. The flight training supervisors simply conduct training and proficiency checks and fly airplanes like other pilots. Assistant chief pilots give advice to crew members regarding safety and compliance with federal aviation regulations and could recommend to higher authorities sanctions for pilot or crew misconduct, but they had no power to hire or fire, cut or raise pay, or to impose any sanction. The power of these individuals to spend company money was so limited that, as one witness stated, their authority "to get reimbursed for donuts" was severely circumscribed.

UPS makes much of the fact that the authority of the assistant chief pilots included sending out "letters of concern . . . [and] congratulatory letters or 'attaboys' " to crew members and that they are paid on a somewhat different basis, although not necessarily more than regular pilots. But "subordinate officials" in many industries fit this pattern. Many lower level employees in personnel and public and employee relations departments fit this same pattern. The fact is that at UPS these pilots had no independent authority to discipline others, to award benefits to anyone, to create significant carrier policy, to commit significant carrier funds, or to place individuals in the organizational hierarchy of the carrier. Any authority they do have is severely circumscribed by operating and policy manuals issued at the management level.

## IV.

Dorsey filed this action in April 1996, more than nine months after his transfer from flight training supervisor to assistant chief pilot. UPS argues that the statute of limitations has run on Dorsey's claim that his transfer was discriminatory and in retaliation for his attempt to organize the pilots. Although the Railway Labor Act does not provide a statute of limitations, UPS asserts that the statute of limitations is six months, borrowing the six month statute of limitations from the National Labor Relations Act. Our court has not specified that this statute of limitations applies to such claims under the Railway Labor Act. But whatever the statute of limitations may be, it did not run in this case. Dorsey did not discover, and could not have discovered, the extent of his injury until he was discharged. His pay was not reduced when he was transferred, and his fate with the company was unclear during the period after he was transferred. The transfer was only the first step of the plan of UPS to deliver the coup de gras to his career in the company. The statute of limitations, whatever it may be, did not start running until the company finally discharged him for his organizing activities. So long as the company was willing to pay him his old salary, and ask him for only a minimal amount of work, while at least on the surface allowing him to continue organizing, his injury was not apparent. Dorsey does not seek compensation or any other remedy for his retaliatory transfer but only for his discharge. The retaliatory transfer was only the first step along the road to discharge. Whatever may be the length of the statute of limitations for the Railway Labor Act, it is not a bar to this action which was filed only a few days after Dorsey was fired and discovered the real extent of his injury.

Accordingly, the summary judgment in favor of the defendant on the issue of liability under the Railway Labor Act is reversed and the case is remanded to the district court with instructions to grant the plaintiff's motion for summary judgment on the issue of liability and to submit the question of damages suffered by the plaintiff to trial by jury in accordance with plaintiff's prayer for relief in his complaint. The court does not reach any arguments by plaintiff for an award of punitive damages or any other measure of damages for these are questions which should be decided in the first instance by the district court.