# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 17, 2016          Decided August 5, 2016

No. 15-1200

ENTERPRISE LEASING COMPANY OF FLORIDA, DOING BUSINESS
AS ALAMO RENT-A-CAR,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 15-1255

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*D. John Sauer* argued the cause for petitioner. With him
on the briefs was *Daniel R. Begian*.

*Greg Lauro*, Attorney, National Labor Relations Board,
argued the cause for respondent. With him on the brief were
*Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*,
Associate General Counsel, *Linda Dreeben*, Deputy Associate
General Counsel, and *Julie B. Broido*, Supervisory Attorney.

Before: GRIFFITH, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by Circuit Judge PILLARD.

PILLARD, *Circuit Judge*:  The National Labor Relations Board concluded that petitioner Enterprise Leasing Company of Florida (Enterprise, or the Company) committed several unfair labor practices in late 2009 and early 2010 at a Miami, Florida, car rental facility.  Enterprise violated the National Labor Relations Act (the Act), the Board determined, by telling employees it was terminating short-term disability benefits on account of their union membership, encouraging an employee to circulate a petition to decertify the Union as its employees' bargaining representative, unilaterally terminating employees' short-term disability benefits, interfering with a union representative's contractual right of access to Enterprise's facility, unlawfully decertifying the Union as its employees' bargaining representative based on a petition tainted by unfair labor practices, and thereafter refusing to bargain with the Union or collect or remit union dues.  *See Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135 (June 26, 2015).  We hold that substantial record evidence supports each of the Board's findings and conclusions.  We lack jurisdiction to consider the Company's additional claim that the Board's remedy was unlawfully punitive, because Enterprise failed to raise the argument before the Board.  Accordingly, we deny its petition and grant the Board's cross-application for enforcement.

## I. Background

### A. Facts

Enterprise is a national car rental company that operates a facility at Miami International Airport, where it rents cars under the Enterprise, National Car Rental, and Alamo Rent-

3

A-Car (Alamo) brands.[1] Enterprise obtained the Alamo operation, among others, during its acquisition of Vanguard Car Rental, USA (Vanguard) in August 2007. At that time, Teamsters Local Union No. 769 (the Union) represented the employees of Alamo Miami (unit employees) in a wall-to-wall bargaining unit. Before the acquisition, the Union and Vanguard had negotiated a collective bargaining agreement for Alamo employees, which was effective from November 29, 2005, through January 2, 2010. In December 2009, after the acquisition, the Union and Enterprise agreed to extend the existing agreement through March 31, 2010, while negotiating a successor agreement.

Enterprise provided benefits to unit employees under a Comprehensive Group Insurance Plan (the Group Plan), referenced in the collective bargaining agreement. Until August 2009, the Group Plan encompassed a subsidiary Vanguard Short-Term Disability Plan (the Vanguard Plan).

Enterprise terminated the Vanguard Plan on August 1, 2009, eliminating the third-party administrator, as it streamlined its National and Alamo human-resources operations. Between that date and the end of 2009, Enterprise continued to provide short-term disability benefits to unit employees, but Enterprise administered those benefits on a self-insured basis instead of through the Vanguard Plan.

---

[1] We draw the facts from the Board's decision, *Enterprise Leasing Co. of Fla*., 362 NLRB No. 135 (June 26, 2015), which incorporated by reference its 2013 decision, *Enterprise Leasing Co. of Fla*., 359 NLRB No. 149 (July 2, 2013), appending the Administrative Law Judge's decision. Accordingly, citations in this section are to the 2013 Board decision reflecting the ALJ's factual findings.

4

Enterprise's provision of short-term disability benefits was short-lived, although the Company only belatedly informed its employees of the change. In previous years, Enterprise typically held a benefits open-enrollment period in October and November each year, but it did not do so in 2009 for the 2010 plan year. When Enterprise Union Steward Marjorie Wisecup asked Enterprise's Human Resource Manager Lissette Dow about the omission, Dow reviewed the 2010 employee-benefits package with Wisecup, but she did not mention that the Company had converted to a self-insured short-term disability benefits plan in anticipation of eliminating those benefits altogether at the end of 2009. Around the same time, Wisecup heard Dow tell other employees not to worry about enrollment, because benefits in 2010 would be the same as in 2009.

It was not until late November or early December, after an open-enrollment period would have closed had it been offered, that Dow informed Wisecup that Enterprise would no longer provide short-term disability benefits to unit employees in 2010. When Wisecup asked why, Dow replied that the collective bargaining agreement did not specify short-term disability benefits; those benefits, she said, were not included in the Group Plan called for by the agreement. Because the agreement did not specify short-term disability benefits, Dow explained, the unit employees could not have them.

In early December, Dow and Enterprise Airport Market Manager Bridget Long conducted several employee meetings to discuss Enterprise's elimination of short-term disability benefits. At one of the meetings, Long informed employees about the change and apologized for the Company's delay in announcing it. Dow acknowledged that when she had met with Wisecup earlier in the fall, she had known about

Enterprise's plan to eliminate short-term disability benefits, but that she had not mentioned the change because she did not think it was a big deal. Another employee, Andy Felgentres, asked Long why the benefits were being eliminated, and Long responded, "because you're union, you can't have short-term disability." *Enterprise Leasing Co. of Fla.*, 359 NLRB No. 149, at *8 (July 2, 2013). When Felgentres said that was discrimination, Long replied, "don't worry, Enterprise has very good lawyers." *Id.*

At another meeting, Enterprise employee Wanda Rivera asked Dow if Enterprise was eliminating short-term disability benefits because of the union contract and whether the Company was eliminating the benefits at other locations. Dow responded that employees at non-union locations would retain their short-term disability benefits. Another employee, Sara Rivera, asked whether employees would still have such benefits if not for the Union, and Dow replied, "yes," the reason the unionized employees would not get the benefits was "because [Enterprise] had to follow the union contract." *Id.* at 9. Dow repeated that at locations where there was no union, employees would keep short-term disability benefits.

On January 1, 2010, Enterprise eliminated the unit employees' short-term disability benefits without notifying or bargaining with the Union.

At around the same time, Cirilo Garcia, an Enterprise employee who was dissatisfied because of the elimination of unit employees' short-term disability benefits, began circulating to unit employees a petition to decertify the Union as their collective-bargaining representative.

Shortly thereafter, on January 4, Union Business Representative Eddie Valero, along with two other Union agents, visited the Miami Alamo facility to investigate a

report that the decertification petition was being circulated on company time. The then-effective collective bargaining agreement provided that "[a]fter making [their] presence known to a member of management," authorized union representatives "shall be permitted to enter the premises of the Employer for the purpose of determining" compliance with the agreement. *Id.* at 12 (quoting Miami Alamo Collective Bargaining Agreement, J.A. 372). Accordingly, upon arrival, Valero attempted to notify a supervisor of his presence. Valero had made similar investigative visits in the past— unannounced until arrival—and had not experienced any problems.

During the January 4 visit, however, Valero and his team ran into trouble. When they arrived, Dow came out of the building with her arms raised, screaming at Valero and demanding to know why he was there. Valero responded that he was conducting an investigation. Dow announced that she would follow him during the visit because she had orders from above. Although Valero told Dow that he would report her conduct to the Board if she interfered with the visit, Dow persisted, following Valero and his team into the building and, once inside, standing beside them for about thirty-five minutes while they sat on a bench. It was only after Valero called the Company's labor-relations coordinator to report the incident that Enterprise manager Long allowed the group to use the break room for their investigation, reminding them not to interrupt the workforce. Dow continued to follow Valero and his group throughout the visit, both outside and inside the building, and retreated only when they returned to the break room, although other managers periodically stopped in to monitor the group. After approximately twenty-five minutes, Valero and his group left the facility.

Just over a week later, on January 13, Enterprise supervisors Larry Elsass and Rodolfo Browne spoke with Garcia on company property. Elsass and Browne asked Garcia how many signatures he had obtained on the decertification petition. At that point, only sixty-six of the unit's 159 employees had signed the petition. When Garcia reported on his progress, Browne said that number was not enough, and told Garcia to go back and get more. Garcia then arranged to secure additional signatures to push the number above the 50 percent mark.

Enterprise withdrew recognition from the Union on January 19, based solely on the decertification petition that by then reflected verified signatures of a majority of unit employees.

Later that month, Enterprise Station Manager Johnny Betancourt interrogated employees about, and solicited them to withdraw, their union membership. And, over the course of the following year, Enterprise made a series of changes to unit employees' terms and conditions of employment without notifying or bargaining with the Union. In February, the Company ceased deducting and remitting union dues for employees who had signed dues-checkoff authorizations, despite the requirement of the collective bargaining agreement (effective through the end of March) to deduct and remit those dues. The Company also made a variety of wage-and-benefits changes, and it declined to process an employee grievance.

## B. Decision Below

Based on the foregoing conduct, between December 18, 2009, and February 16, 2011, the Union filed a series of unfair labor practice charges against Enterprise. On April 8, 2011, the NLRB's Acting General Counsel issued an

amended, consolidated complaint alleging that Enterprise had committed multiple violations of section 8(a)(1) and (a)(5) of the Act, 29 U.S.C. § 158(a)(1), (5).

Among other things, the complaint charged that Enterprise violated section 8(a)(1) when Betancourt coercively interrogated employees about, and solicited them to withdraw, their union membership. Although the Company initially denied that it committed those unfair labor practices, it later admitted to them at the hearing before the ALJ, and it does not contest them here. We therefore summarily enforce the Board's findings and order as to those charges. *See Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012); *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006).

The Acting General Counsel's complaint further charged that Enterprise violated section 8(a)(1) of the Act by telling employees that they would lose their short-term disability benefits because of their union representation, and encouraging employees to circulate a petition to decertify the Union as their bargaining representative. The complaint also alleged that the company violated section 8(a)(1) and (a)(5) by unilaterally terminating short-term disability benefits, interfering with the Union's contractual right of access to Enterprise's facility, withdrawing recognition from the Union as the employees' collective-bargaining representative based on a tainted decertification petition, and thereafter unilaterally changing terms of employment, refusing to bargain with the Union regarding an employee grievance, and failing to deduct and remit dues to the Union. Although Enterprise admitted to unilaterally terminating short-term disability benefits, withdrawing recognition from the Union, and declining to bargain with the Union post-withdrawal, it contested that any

of the alleged conduct was unlawful and denied the commission of the other unfair labor practices charged.

After an evidentiary hearing, on April 11, 2012, the ALJ issued a decision that Enterprise had violated the Act as alleged, save one charge of unlawful interrogation not at issue in this petition. Enterprise excepted to the ALJ's decision. The General Counsel, too, filed exceptions seeking, among other things, an amended remedy, which Enterprise generally opposed.

On July 2, 2013, the Board issued a decision and order (the 2013 Decision) largely adopting the ALJ's findings and conclusions and amending the ALJ's remedy as requested by the Board. *See Enterprise Leasing Co. of Fla.*, 359 NLRB No. 149. The following year, while Enterprise's petition for review of the Board's decision was pending, the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), invalidated the appointments of two of the three 2013 Decision panel members. The Board set aside the 2013 Decision, and, on June 26, 2015, upon *de novo* review, a lawfully constituted panel of the Board issued a Decision and Order largely adopting the 2013 Decision, *see Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1-4, with one Member dissenting in part, *see id.* at *4-8. We discuss the specifics of the Board's Decision and Order at greater length where relevant below. Enterprise timely petitioned for review of the Board's decision, and the Board filed a cross-application for enforcement of its order. We have jurisdiction under 29 U.S.C. § 160(e)-(f).

## II. Section 8 Violations

Enterprise contests the substantiality of the evidence underlying the Board's findings that it violated section 8(a)(1)

and (a)(5) of the Act. Each of Enterprise's arguments comes up short.

## A. Standard of Review

Assuming a "limited" role, *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012), we review the Board's decision to determine whether it is supported by substantial evidence in the record as a whole, *see* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). We must "uphold[] the Board's application of law to facts unless arbitrary or otherwise erroneous, and give[] substantial deference to inferences the Board draws from the facts." *Allied Mech. Servs.*, 668 F.3d at 764 (internal quotation marks and citations omitted). "An ALJ's determinations regarding the credibility of witnesses will not be reversed 'unless those determinations are hopelessly incredible, self-contradictory, or patently unsupportable.'" *Stephens Media*, 677 F.3d at 1250 (quoting *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 924 (D.C. Cir. 2005)). We must "abide [the Board's] interpretation of the Act if it is reasonable and consistent with controlling precedent." *Brockton Hosp. v. NLRB*, 294 F.3d 100, 103 (D.C. Cir. 2002).

## B. Section 8(a)(1) Violations

We begin with Enterprise's challenge to the Board's determinations that it violated section 8(a)(1) of the Act. The Board found two violations. The first occurred when Enterprise repeatedly told its employees that it was terminating their short-term disability benefits on account of their union membership. The second was due to Enterprise managers encouraging an employee to circulate a petition to

decertify the Union as its employees' bargaining representative.

Under section 8(a)(1), it is "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7] of [the Act]." 29 U.S.C. § 158(a)(1). Section 7 grants employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. An employer's statement that, "considering the totality of the circumstances, . . . has a reasonable tendency to coerce or to interfere with those rights," violates section 8(a)(1). *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001); *see Bridgestone Firestone S.C.*, 350 NLRB 526, 529 (2007). In reviewing section 8(a)(1) claims, the Board "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

### i. Withholding Benefits from Employees Because of Union Representation

Enterprise challenges on evidentiary grounds the Board's conclusion that the Company violated section 8(a)(1) of the Act by informing employees it was terminating their short-term disability benefits because of their union representation. An employer violates section 8(a)(1) when it "threaten[s] to penalize employees if they choose union representation, or . . . offer[s] to reward employees if they reject it." *Avecor, Inc. v.*

*NLRB*, 931 F.2d 924, 931 (D.C. Cir. 1991) (internal citations omitted). Such threats and promises will violate the Act, whether they are explicit or implicit, *see Unifirst Corp.*, 346 NLRB 591, 593 (2006); the dispositive question is whether an employee "could reasonably perceive a direct connection between union activities" and loss of a job or benefit, *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 545 (D.C. Cir. 2006).

Incorporating the ALJ's decision, the Board found that the statements made by Dow and Long at various employee meetings had a reasonable tendency to interfere with section 7 rights, and thus were unlawfully coercive. *Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1 & 2 n.3. Enterprise supervisors Dow and Long explained to unit employees that they would lose their short-term disability benefits because they were union and because the union contract did not specify provision of such benefits, *Id.* But the Company would continue to provide those benefits, Long explained, to employees at other, non-union facilities. *Id.* From Dow and Long's statements, the Board concluded, *see id.*, employees could "reasonably perceive a direct connection between" their union membership and Enterprise's withdrawal of an important benefit. *Progressive Elec.*, 453 F.3d at 545.

Enterprise contends, and dissenting Board Member Miscimarra agreed, that the Board inaccurately paraphrased the record. Enterprise insists that it simply offered its employees truthful information about their collective bargaining agreement, which cannot constitute an unfair labor practice. Specifically, Enterprise urges that the Board erred in not relying solely on the version of events described in employee Wisecup's grievance form, in which she noted only that Dow and Long "informed us that the reason for [the elimination of short-term disability benefits] is [] the fact that

the bargaining [a]greement does not specify that [the benefit] has to be given to employees." Wisecup Grievance Form, J.A. 843.

Enterprise's argument ignores substantial record evidence that directly supports the Board's finding. According to Wisecup's testimony at the hearing before the ALJ, Long explained to employees "because you're union, you can't have short-term disability." Testimony of Marjorie Wisecup, J.A. 54. Wisecup additionally recounted that, when accused of discriminating based on union membership, Long stated, "don't worry, Enterprise has very good lawyers." *Id.* Wisecup's account was consistent with those given by two other employees, Sara Rivera and Wanda Rivera. Moreover, in light of Dow and Long's contemporaneous statements linking the loss of benefits to their union-represented status, the employees readily could have understood Dow and Long's references to the collective bargaining agreement—as recounted in Wisecup's grievance form—also to tie the withdrawal of those benefits to union membership. Dow and Long's union-contract justification, viewed in context, thus "went beyond permissible statements of fact." ALJ Decision, J.A. 2096; *see Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1 & 2 n.3.

Finally, to the extent Dow and Long's version of events differed from the testimony of employees Wisecup, Sara Rivera, and Wanda Rivera, the ALJ specifically credited the employees' testimony, which was mutually corroborative and adverse to their current employer, favoring reliance on that testimony. Those well-reasoned credibility determinations were not "hopelessly incredible, self-contradictory, or patently unsupportable." *Stephens Media*, 677 F.3d at 1250. Substantial evidence thus supports the Board's determination that, under the circumstances, Dow and Long's justification

for eliminating short-term disability benefits was unlawfully coercive.

ii.   Encouragement of Decertification Petition

Enterprise also contests the Board's determination that it violated section 8(a)(1) by encouraging an employee to circulate a petition to decertify the Union as the employees' bargaining representative.  Employer statements about union decertification are not altogether off limits.  For example, the Board has held that an employer does not violate the Act if it furnishes accurate information about, or ministerial aid to, the decertification process, and does so without making threats or offering benefits.  *See Lee Lumber & Bldg. Material Corp.*, 306 NLRB 408, 409-10 (1992); *E. States Optical Co.*, 275 NLRB 371, 372 (1985).   An employer violates section 8(a)(1), however, "by 'actively soliciting, encouraging, promoting, or providing assistance in the initiation, signing, or filing of an employee petition seeking to decertify the bargaining representative.'" *Mickey's Linen & Towel Supply, Inc.*, 349 NLRB 790, 791 (2007) (quoting *Wire Prods. Mfg. Co.*, 326 NLRB 625, 640 (1998), *enforced sub nom. NLRB v. R.T Blankenship & Assocs., Inc.*, 210 F.3d 375 (7th Cir. 2000) (unpublished)); *see E. States Optical Co.*, 275 NLRB at 372.

The Board adopted the ALJ's finding that supervisors Elsass and Browne unlawfully coerced employee Cirilo Garcia to collect more signatures when, after instructing him that the number of signatures he had gathered was not enough, they told him to go back and get more. *Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1 & 2 n.3. Although the Board did not find that the statements constituted "unlawful[] assist[ance]," it concluded that the direct exhortation from management, "[e]ven assuming the conversation was friendly," could only have further impelled

Cirilo to continue his campaign, unlawfully promoting it. *Id.* at 2 n.3. It did not matter, the Board explained, that Garcia himself had commenced and led the campaign before the conversation at issue.

As an initial matter, contrary to Enterprise's contention, the Board "engage[d] in reasoned decisionmaking" in thus adopting and elaborating on the thorough, well-reasoned analysis of the ALJ. *Int'l Union of Operating Eng'rs, Local 147, AFL-CIO v. NLRB*, 294 F.3d 186, 188 (D.C. Cir. 2002). Moreover, the record contains substantial evidence to support the findings underlying the violation. According to the credited testimony of Enterprise employee Glinda Jefferies, Jefferies observed Garcia showing the decertification petition to Elsass and Browne. Jefferies overheard them ask Garcia how many signatures he had gotten, and Browne told him "it wasn't enough, to go back and get more." Testimony of Glinda Jefferies, J.A. 78. Garcia then arranged to secure additional signatures to push the number "over the 50 percent mark." Testimony of Jesus Torres, J.A. 202.

The record refutes Enterprise's contention that Jefferies's account is incredible because Jefferies, who does not speak Spanish, would not have been able to understand the conversation with Garcia, who does not speak or understand very much English. As the ALJ explained, Elsass, who speaks only English, testified that he was able to communicate basic instructions to Garcia in English and that other employees could translate for him when necessary, confirming that Jefferies indeed could have overheard the conversation to which she testified.

Enterprise further argues that even if the conversation transpired as Jefferies testified, Elsass and Browne solely provided employees truthful information about the

decertification process and how many signatures would be required for a petition to be successful. That argument is only partly correct. The first part of Browne's statement, informing Garcia that the number of signatures he had collected "wasn't enough," Testimony of Glinda Jefferies, J.A. 78, is what Enterprise suggests—a lawful, accurate statement about the decertification process that, by itself, constitutes no more than ministerial aid. *See Lee Lumber & Bldg. Material Corp.*, 306 NLRB at 409-10; *E. States Optical Co.*, 275 NLRB at 372; *see also Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972, 975 (D.C. Cir. 1998).

But Browne did not stop there. Instead, he directed Garcia "to go back and get more" signatures. Testimony of Glinda Jefferies, J.A. 78. That statement, on which the Board relied in finding a violation of section 8(a)(1), constitutes not merely the provision of accurate information, but the "active[] . . . encourag[ement]" and "promot[ion]" of a decertification petition that is prohibited by the Act. *Mickey's Linen & Towel Supply, Inc.*, 349 NLRB at 791.

We therefore deny Enterprise's petition for review and grant the Board's cross-application for enforcement as to the section 8(a)(1) violations.

### C. Section 8(a)(1) and (a)(5) Violations

We next address Enterprise's challenge to the Board's conclusion that it violated section 8(a)(1) and (a)(5) of the Act by unilaterally withdrawing short-term disability benefits, interfering with union agents' contractual right of access to the Miami Alamo facility, unlawfully decertifying the Union as its employees' bargaining representative, and then refusing to bargain with the Union or collect or remit union dues. Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the

representatives of his employees." 29 U.S.C. § 158(a)(5). An employer that violates section 8(a)(5) also derivatively violates section 8(a)(1)'s prohibition against "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section [7 of the Act]," *id.* § 158(a)(1), including the right to "bargain collectively through representatives of their own choosing," *id.* § 157. *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983); *Pac. Coast Supply, LLC v. NLRB*, 801 F.3d 321, 325 n.2 (D.C. Cir. 2015). For the reasons that follow, we deny Enterprise's petition as to all of the challenged section 8(a)(5) and derivative section 8(a)(1) violations.

    i.    Unilateral Termination of Benefits

Enterprise first contests the Board's decision that the Company's unilateral termination of short-term disability benefits violated section 8(a)(1) and (5) of the Act. Section 8(d) provides that the obligation to bargain protected by section 8 extends to "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Those mandatory bargaining subjects include employee benefits, such as short-term disability. *See NLRB v. Katz*, 369 U.S. 736, 743-44 (1962). "[A]n employer's unilateral change in conditions of employment under negotiation is . . . a violation of [section] 8(a)(5)," and, derivatively, 8(a)(1). *Id.* at 743; *see Int'l Bhd. of Elec. Workers Local 1466, AFL-CIO v. NLRB*, 795 F.2d 150, 153 (D.C. Cir. 1986).

In this case, a divided Board determined that Enterprise committed an unfair labor practice by eliminating employees' short-term disability benefits at the end of 2009 without first notifying the Union or giving it an opportunity to bargain. Enterprise does not contest that it unilaterally terminated the benefits at issue, but argues that the Union waived or,

alternatively, contracted away the protections of section 8(a)(5).

Where a bargaining unit has affirmatively waived its right to negotiate as to a subject, an employer's unilateral change to contract terms on that subject does not violate the Act. But such waiver occurs only upon a bargaining unit's "clear and unmistakable" relinquishment of the right. *Ga. Power Co*., 325 NLRB 420, 420 (1998) (quoting *Metro. Edison Co.*, 460 U.S. at 708). Agreeing with the ALJ, the Board concluded that the parties' then-effective collective bargaining agreement did not effect a waiver of the Union's statutory right to bargain over the elimination of short-term disability benefits; the unilateral change on that mandatory subject of bargaining thus violated the Act. *Enterprise Leasing Co. of Fla*., 362 NLRB No. 135, at *1-2 & n.4. Enterprise challenges the Board's non-waiver determination, contending that the parties' agreement effected a "clear and unmistakable" waiver of the bargaining unit's right to negotiate benefits encompassed within the Group Insurance Plan.

Enterprise alternatively challenges the Board's order by invoking the contract-coverage doctrine. In Enterprise's view, the collective bargaining agreement itself covers anything having to do with the provision of benefits, including short-term disability benefits, and thereby gives Enterprise a contractual right to terminate those benefits without bargaining. Under the contract-coverage doctrine, when a subject is "covered by the collective bargaining agreement," the union already "has exercised its bargaining right" on the matter—by, for example, agreeing to a particular benefits plan that includes a reservation-of-rights clause— leaving the employer free to make unilateral changes to such a covered plan without running afoul of the Act. *BP Amoco*

*Corp. v. NLRB*, 217 F.3d 869, 873 (D.C. Cir. 2000) (quoting *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993)).

We need not reach the merits of either Enterprise's waiver or its contract-coverage contention, or otherwise venture to interpret the collective bargaining agreement, because we sustain the Board's determination on the ground that at the time Enterprise terminated the contested benefits, they were no longer provided pursuant to the collective bargaining agreement. According to the Board, the record established that as of August 2009—well before Enterprise's January 1, 2010, unilateral termination of the short-term disability benefits—the Company had begun self-administering those benefits. *Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1-2. The Board relied on that change as an "alternative," and "independently sufficient basis" to uphold the ALJ's decision. *Id.* at *2; *see Local 702, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000) ("[S]ince the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, it . . . is free to substitute its judgment for the ALJ's." (internal quotation marks and brackets omitted)). Accordingly, "[e]ven assuming the [Company's] waiver arguments might otherwise have merit," the Board explained, "they fail here because, after August 1, 2009, [the Company] did not provide [short-term disability] benefits pursuant to any 'plan,' or at least not pursuant to one of the Vanguard plans referenced in the [agreement]." *Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1. The Company's failure to bargain over that mandatory subject of bargaining thus violated the Act. *Id.* at *3.

Substantial record evidence supports the Board's conclusion that, at the time Enterprise unilaterally terminated the short-term disability benefits, the Company did not

provide those benefits pursuant to any plan referenced in the collective bargaining agreement. Specifically, Dana Beffa, Enterprise's vice president of employee benefits, testified that Enterprise terminated the Vanguard Plan on August 1, 2009, and the third-party administrator ceased administering short-term disability benefits. From August 1 until the end of the year, Beffa explained, Enterprise itself administered the benefits on a self-insured basis. Enterprise accordingly cannot rely on any waiver or contract coverage the agreement might have effected with respect to Group Plan benefits.

Nor was the Company's provision of short-term disability benefits after August 1 a "one-time gratuity" exempt from collective-bargaining requirements, as Enterprise claims. Reply Br. 12. Enterprise provided the benefits—first through the Vanguard Plan and then on its own, with no break in coverage—with such regularity to "justif[y] its employees' expectations that they would receive the" benefit in the future. *Sykel Enters., Inc.*, 324 NLRB 1123, 1125 (1997). We therefore decline to disturb the Board's finding that Enterprise's unilateral benefits termination violated the Act.

ii.    Interference With Union's Workplace Access

Enterprise further challenges the Board's conclusion that Enterprise violated section 8(a)(1) and (a)(5) of the Act by interfering with the Union's contractual right of access to the Miami facility. Where a collective bargaining agreement permits union officials to access an employer's worksite, it is a violation of section 8(a)(5) to interfere with the bargained-for access. *See Frontier Hotel & Casino*, 309 NLRB 761, 765 (1992), *enforced sub. nom. NLRB v. Unbelievable, Inc.*, 71 F.3d 1434 (9th Cir. 1995). Any "undue restriction[] upon a union representative's access to the worksite impairs a union's ability to police its agreement and thereby diminishes

employees' Section 7 rights." *Houston Coca-Cola Bottling Co.*, 265 NLRB 766, 777 (1982), *enforced as modified sub. nom. NLRB v. Great W. Coca-Cola Bottling Co*., 740 F.2d 398 (5th Cir. 1984).

Based on Eddie Valero's credited testimony and the terms of the applicable collective bargaining agreement, the Board found that, on January 4, 2010, Dow and Long interfered with the Union's contractual right of access by confronting, yelling at, following, and limiting access by Eddie Valero and other union agents when they visited the Alamo Miami facility to investigate a reported violation of the collective bargaining agreement. *Enterprise Leasing Co. of Fla*., 362 NLRB No. 135, at *1.

Enterprise does not contest that it interfered with Valero's access. Instead, it insists that Valero had no right of visitation because, it contends, he failed to provide advance notice, was not on site to monitor compliance with the collective bargaining agreement, and interfered with Enterprise's business. The Board's reasonable conclusions to the contrary have substantial record support.

The Company's first contention fails because the agreement plainly does not require advance notice; it requires Union representatives to "mak[e] [their] presence known to a member of management" upon arrival. Miami Alamo Collective Bargaining Agreement, J.A. 372. Once they do so, those representatives "shall be permitted to enter the premises" to conduct an investigation. *Id.* According to Valero's credited testimony, in the past Valero never had given any additional, advance notice before such investigative visits—a point corroborated by Dow on cross-examination—and he had never encountered any problems until the visit on January 4. And on that visit, too, Valero immediately gave

the required notice—to Dow herself—upon arriving at the property. The record adequately supports the Board's conclusion that the agreement's notice requirement was satisfied.

Enterprise's attempt to impugn Valero's motives and on-site conduct fares no better. In support of its version of events, the Company points only to Long's account of the union representatives' conduct on January 4. That testimony does not speak to Valero's reasons for being on site, however, and, to the extent it suggests that Valero interrupted workplace activities, it conflicts with Valero's detailed, credited testimony about his group's interactions at the Alamo Miami facility that day. Substantial record evidence thus supports the Board's finding that Enterprise interfered with the Union's right of access to the Alamo facility.

### iii. Withdrawal of Union Recognition

Enterprise next takes issue with the Board's conclusion that the Company's withdrawal of recognition from the Union violated the Act. Although "an incumbent union enjoys a presumption that it represents a majority of employees," *BPH & Co. v. NLRB*, 333 F.3d 213, 217 (D.C. Cir. 2003), an employer may overcome the presumption and "unilaterally withdraw recognition from a union if it can show through objective evidence that the union has lost majority support as, for example, by presenting a petition signed by a majority of employees in the bargaining unit stating that they no longer wish to be represented by the union," *SFO Good-Nite Inn, LLC v. NLRB*, 700 F.3d 1, 6 (D.C. Cir. 2012).

An employer's "privilege" to withdraw recognition based on a petition from a majority of employees "is not absolute." *Id.* "[I]f unfair labor practices 'significantly contribute to such a loss of majority or to the factors upon which doubt of

such majority is based'"—thus "taint[ing]" the decertification petition—then "the employer may not withdraw recognition" from the union. *BPH & Co.*, 333 F.3d at 217-18 (quoting *St. Agnes Med. Ctr. v. NLRB*, 871 F.2d 137, 146-47 (D.C. Cir. 1989)). Where unfair labor practices alleged to have tainted the decertification process are not directly related to that process, the Board applies the four-factor test articulated in *Master Slack Corp.*, 271 NLRB 78, 84 (1984), to evaluate the causal link between the violations and the decreased union support. But if the employer's unfair labor practices involved the decertification process itself, the Board does not demand any such showing of causation between the unfair labor practices and the anti-union vote; the Board will presume that a decertification petition is tainted where it was instigated or propelled by an employer. *See SFO Good-Nite Inn*, 700 F.3d at 8. If taint is established, withdrawal of recognition violates section 8(a)(5), and thus also 8(a)(1). *See NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 778 (1990).

In this case, the Board determined that the Company violated the Act by unlawfully withdrawing recognition from the Union based solely on a decertification petition tainted by the aforementioned unfair labor practices. *See Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1-3. Enterprise disputes that any of the cited conduct contributed to the loss of majority support reflected in the signed petition, arguing at length that each alleged unfair practice was insufficiently significant, close in time, or otherwise related to the petition to have tainted the petition under the *Master Slack* test. We need not, and do not, reach the merits of those arguments. As the Board found, the Company's unlawful propulsion of the decertification petition—through the direction of Enterprise supervisors Elsass and Browne to employee Garcia, *see supra* Section II.B.ii.—constitutes a per se taint of that petition.

*SFO Good-Nite Inn*, 700 F.3d at 8. We therefore enforce that portion of the Board's order.

### iv. Post-Withdrawal Actions

The Board additionally concluded that, after the Company withdrew its recognition from the Union, Enterprise violated section 8(a)(5), and thus also 8(a)(1), by failing to deduct and remit dues to the Union pursuant to the contractual dues-checkoff provision in the still-effective collective bargaining agreement, unilaterally changing the employees' wages and other terms and conditions of employment, and declining to process an employee grievance. *Enterprise Leasing Co. of Fla.*, 362 NLRB No. 135, at *1-3. Enterprise admits that it engaged in all the post-withdrawal conduct underlying those violations, and that it did so without bargaining with the Union. It claims, however, that its post-withdrawal conduct did not violate the Act because its withdrawal of recognition from the Union was lawful. Because the post-withdrawal violations thus rise and fall with the validity of the withdrawal itself and, as we have concluded, the Board's determination that the withdrawal violated the Act is supported by substantial evidence and not otherwise arbitrary, *see* discussion *supra* Section II.C.iii., we deny Enterprise's petition for review, and grant the Board's cross-application for enforcement, of the Board's order that the Company's post-withdrawal conduct violated section 8(a)(1) and (a)(5).

### III. Challenge to Remedial Order

Finally, Enterprise challenges the Board's remedial order as unlawfully punitive. The Board ordered Enterprise to reimburse the Union from its own funds for all union dues it failed to pay after withdrawing recognition from the Union. Amending the ALJ's remedy, the Board further barred

Enterprise from recouping those unpaid dues from employees. The Company claims that the Board's order goes beyond restoring the *status quo* because, had the dues been paid in the ordinary course, the employees, not the Company, would have had to shoulder their cost. The Board counters that this court lacks jurisdiction to review Enterprise's challenge to the recoupment bar because Enterprise failed to raise its objections before the Board as required under section 10(e) of the Act. We agree with the Board.

Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see also* 29 C.F.R. § 102.46(b), (c)(3). Section 10(e) is a "jurisdictional bar," in the face of which we are "powerless, in the absence of extraordinary circumstances, to consider arguments not made to the Board." *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008); *see Nova Se. Univ. v. NLRB*, 807 F.3d 308, 313 (D.C. Cir. 2015).

Enterprise failed to challenge the recoupment bar before the Board as section 10(e) requires. Nowhere in any of its filings in the proceedings below did Enterprise argue that it was impermissibly punitive or otherwise unlawful for the Board to prevent Enterprise from collecting from its employees the dues it had failed to pay to the Union. Enterprise objected generally to the ALJ's remedy, but that remedy did not contain any recoupment bar. "[A]n exception, no matter how broadly formulated, cannot preserve an objection to something that the ALJ never imposed." *HTH Corp. v. NLRB*, 823 F.3d 668, 673 (D.C. Cir. 2016).

It was the Acting General Counsel's exceptions that first requested the recoupment bar the Board eventually imposed, but Enterprise's objections to those exceptions were silent on the subject. Instead, the Company focused on the dates of its unpaid-dues obligations, contending that the ALJ correctly declined to order dues collection beyond the March 2010 expiration of the collective bargaining agreement. When the Board amended the ALJ's remedy to prevent Enterprise from recouping the unpaid dues from employees, Enterprise failed to file a motion for reconsideration addressing the recoupment bar. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982); *HTH Corp.*, 823 F.3d at 673.

Board Member Miscimarra's dissent, which viewed the Board's recoupment-bar remedy to be impermissibly punitive, does not excuse Enterprise's failure to raise the objection. "[A] party may not rely on arguments raised in a dissent or on a discussion of the relevant issues by the majority to overcome the § 10(e) bar; the Act requires the party to raise its challenges itself." *HTH Corp.*, 823 F.3d at 673.

Notwithstanding its failure to make the argument below, Enterprise contends that another party—the Acting General Counsel—sufficiently raised the recoupment-bar "issue" in his exceptions to the ALJ's decision and remedy. Enterprise Br. 57 n.8; Reply Br. 23-27. As support, the Company invokes our decision in *Mourning v. NLRB*, 559 F.2d 768, 771 & n.5 (D.C. Cir. 1977) (per curiam), where we held that a petitioner's failure to raise an argument before the Board did not result in its waiver under section 10(e), because the Board's General Counsel sufficiently had done so. But *Mourning* is inapposite here. There, the petitioner was not "precluded from pressing the issue," because the precise question already had been identified and countered by the General Counsel. *Id.* Here, in contrast, the Acting General

Counsel neither raised nor refuted the argument petitioner now advances. The General Counsel excepted to the ALJ's finding that Enterprise had not violated the Act by failing to collect dues after March 2010, when the collective bargaining agreement expired, and also excepted to the ALJ's remedy on various grounds. As relevant here, it sought modification of the remedy to include remittance of dues to the Union after March 2010, as well as "a prohibition against [Enterprise] recouping the dues monies owed to the Union from its employees' wages." Acting General Counsel's Exceptions, J.A. 2119. In requesting the recoupment bar, the Acting General Counsel identified that specific remedy. But it did not thereby put before the Board and preserve for our review Enterprise's objection that such remedy is impermissibly punitive. Enterprise's "argument was not made to the Board and so comes too late." *W & M Props.*, 514 F.3d at 1345. We thus lack jurisdiction to consider it. *See Woelke*, 456 U.S. at 665.

\* \* \*

For the reasons set forth above, we deny Enterprise's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*